771 A.2d 672 (2001)
339 N.J. Super. 278
Edith ANYANWU, Plaintiff-Appellant,
v.
Longy ANYANWU, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 21, 2001.
Decided April 12, 2001.
*673 Thomas J. Snyder, Denville, argued the cause for appellant (Einhorn, Harris, Ascher, Barbarito, Frost & Ironson, attorneys; Mr. Snyder, of counsel and on the brief).
Charles C. Chikezie and Sebastian O. Ibezim, Jr., East Orange, argued the cause for respondent (Mr. Chikezie, on the brief).
Before Judges STERN, COLLESTER and FALL.
The opinion of the court was delivered by COLLESTER, J.A.D.
Pursuant to leave granted, plaintiff Edith Anyanwu appeals from an order of the Family Part, Morris County, on February 9, 2001. The order released the defendant, Longy Anyanwu, from custody in the Morris County Correctional Facility, to which he was confined on August 14, 1997. The parties are citizens of Nigeria who have resided in the United States for over twenty years. Defendant was a professor at Montclair State University prior to his incarceration.
The parties were married in Baltimore, Maryland, on August 25, 1984. Defendant claims an earlier marriage in Nigeria on May 26, 1984, but plaintiff maintains this was only a customary ceremony to announce their engagement and that defendant was not even present. Their two children were born in the United States: Uchechi, born June 1, 1985; Ogechi, born October 19, 1986, and now deceased. The children had dual citizenship with Nigeria.
By 1996 there were significant marital problems. Plaintiff filed a complaint under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17, and obtained a Final Restraining Order which she later voluntarily dismissed. Defendant filed for a divorce in Nigeria in August 1996, although plaintiff contends that she was never served.
*674 In June of 1997 the parties and their children traveled to Nigeria where they have over 100 family members. Plaintiff avers that while in Nigeria defendant told her that the marriage was over, confiscated her passport and denied her access to the children. Claiming that she was in fear for her physical safety, she returned alone to the United States in July 1997. Later that month defendant also returned. The children remained in Nigeria.
On August 5, 1997, plaintiff filed another complaint under the Domestic Violence Act, N.J.S.A. 2C:25-17, and a Temporary Restraining Order directed defendant to return the children to plaintiff's custody. Defendant was served with the order after his return from Nigeria. At a hearing on August 11, 1997, the restraints against defendant were continued, and he was directed to produce the children in court three days later.
On August 14, 1997, both parties appeared, but the children were not present. Defendant advised the court that his father had decided to raise the children according to the customs of Nigeria and would not allow them to return to the United States. Nevertheless, the judge found that defendant could exert sufficient power over his family in Nigeria to have the children returned, held him in violation of the Final Restraining Order and pursuant to R. 1:10-3 remanded defendant to the Morris County Correctional Facility until he complied with the order. Defendant has remained confined since that date.
After a review hearing on September 4, 1997, defendant was again found in contempt for a violation of the Final Restraining Order and was remanded to the county jail. We granted leave to appeal on defendant's emergent application and remanded to the Family Part judge with the direction that defendant receive a "trial-type" hearing to give him an opportunity to prove his claimed inability to comply with the order and with the further direction to the hearing judge that if defendant was successful, he should be released immediately.
That hearing was held on September 18, 1997. Defendant testified he called relatives in the United States to aid in convincing his father to permit the children to leave Nigeria but was advised that his father refused. He added that he was told the children were no longer living with his father but with an aunt and uncle in Nigeria.
At the hearing defense counsel also produced a letter dated September 10, 1997 from Chief Val Onugha, Chairman of the Amaraka Customary Court of Imo State, Nigeria, directed to the trial judge stating that the issue of custody of the two daughters was before the Customary Court in Nigeria as a result of the 1996 divorce action filed by defendant and that the Nigerian court ordered that the children were to remain in Nigeria. The letter also stated that jurisdiction was based on a celebration of a customary marriage in Nigeria and that plaintiff had knowledge of the suit brought by defendant. The letter concluded:
Finally, Longy's lawyers have hinted [to] me of the possibility of Longy be[ing] forced to sign papers which would enable the children [to] be returned to America. I have taken note of this, and as long as Nigeria remains independent I shall not honor any document signed by Longy because as long as he is [in] prison and in Chains (as "the star-ledger" reports), any document he signs cannot be free of duress.

In response to the inquiry of the judge, defendant declined to sign or submit documents to the Nigerian court or other authorities because of the statements in the *675 letter from Chief Onugha that no weight would be given to any requests from him while he remained in prison. The hearing judge found that defendant's testimony and the letter from the Nigerian court were insufficient to meet defendant's burden to prove an inability to comply with the court order. Defendant was remanded back to confinement.
On September 24, 1997, defendant appealed. We affirmed the hearing judge and emphasized that defendant was not in jail for failure to produce his children but because he had not abided by the order of the trial court to make good faith and best efforts to do so. We remanded with a direction to focus the R. 1:10 3 order more sharply to detail exactly what steps defendant needed to take to purge himself of contempt and secure his release. On remand and after considering arguments of counsel the hearing judge entered an order on January 4, 1998, setting forth the following actions by defendant that would satisfy the requirement that he act in good faith to achieve the return of his daughters to the United States:
1. Direct a letter to his father authorizing his father to turn over custody of the Defendant's children to a representative of the United States Department of State or such person as the Plaintiff may designated.
2. File an application to the appropriate Court in Nigeria requesting that custody of the children be turned over to the Plaintiff/mother so that they may be returned to the State of New Jersey for further proceedings.
3. Request that the appropriate Court in Nigeria appoint a Guardian of his children, request the court to direct that custody of the children be turned over to the Guardian and that the Guardian deliver the children into the custody of the United States Department of State at the Embassy/Consulate in Lagos.
4. Direct his father to make immediate arrangements for the return of the children to New Jersey including making arrangements to take the children to the airport and place them on a flight whose ultimate destination is New Jersey.
5. Write a letter to the President and/or Prime Minister of Nigeria requesting their assistance in obtaining the return of his children to New Jersey.
6. Request his father, the government and the Courts in Nigeria to Order that the sister and brother-in-law of Defendant who last had custody of the children immediately to notify him of their latest whereabouts and medical condition.
7. File a Certification/Affidavit with the United States Department of State, the Nigerian Consulate and the United States Embassy in Lagos stating that he is the father of the children and he wants them returned to the United States. He must authorize whatever steps are necessary to effect the return of the children to New Jersey.
Unknown to the Family Part judge at that time was that on November 2, 1997, Ogechi, the youngest daughter, died at age eleven, reportedly from malnutrition.
Defendant appealed from the January 4, 1998 order. We affirmed in an unpublished opinion on April 2, 1998, in which we stated the following:
Mr. Anyanwu persists in mischaracterizing the reason for his incarceration. As we previously stated, he is not in jail for failure to produce the children but because he has refused to try. The fact that he thinks his efforts will be fruitless is of no consequence. Judge Friend is not convinced that this is so and his conclusion that every effort should be made by Mr. Anyanwu to secure the *676 return of the children is entirely reasonable. Mr. Anyanwu has the key to freedom in his pocket. He needs only to abide by Judge Friend's order to secure his release. Again, he is not in jail because he cannot ensure the return of the children but because he refuses to try. If he takes some or all of the steps outlined by the trial judge and indicates that he is making a good faith effort to comply with the judge's order his release should be reconsidered.
[Anyanwu v. Anyanwu, A-0276-97 consolidated into I/M/O Anyanwu, A-0773-97 (App. Div., April 4, 1998).]
Defendant's petition for certification was denied. 162 N.J. 129, 741 A.2d 96 (1999). In the interim plaintiff filed a complaint for divorce in the Family Part on December 2, 1998, in which she sought custody of the surviving child, Uchechi. Defendant filed an answer, and the case is still pending trial.[1] We further note that the defendant submitted papers to the Family Part judge that purport to be a judgment of the Customary Court in Nigeria on August 13, 1998 dissolving the customary marriage between the parties and awarding custody to defendant based on his complaint filed in 1996. Plaintiff has responded that if the judgment is authentic, it was the product of corruption or bribery. She also asserts that she had an order of a Nigerian court incorporating the award of custody to her under the Final Restraining Order entered in New Jersey.
On March 12, 1999, defendant again moved for release from custody, and again the Family Part judge denied his motion on the basis that no efforts were made by defendant to effect the return of the surviving child to New Jersey. Defendant moved for leave to appeal. Because plaintiff did not submit opposing papers, we were concerned as to the validity of the order enforcing litigant's rights under R. 1:10-3. We issued a limited remand to determine whether the plaintiff's position with respect to defendant's non-compliance remained the same. We added that defendant was to be released immediately if the hearing judge found that plaintiff did not seek enforcement or defendant showed compliance with the January 5, 1998 order. Anyanwu v. Anyanwu, 333 N.J.Super. 231, 235-36, 755 A.2d 593 (App.Div.2000). (Anyanwu I).
After the trial judge reported plaintiff was still desirous of enforcement and "defendant offered no additional information that would manifest compliance with the extant order," we then considered defendant's arguments on appeal. We affirmed the holding of the trial judge that defendant remained in violation of the court's order and had not met the burden of persuasion that compliance was beyond his abilities. We added the following:
[D]efendant has not only failed to demonstrate his incapacity to comply with the ultimate obligation, the return of the surviving child, but he has also failed to take specific steps ordered by the trial court-at our direction in a prior appeal-designed to achieve that objective, and has not shown an inability to perform even those discreet responsibilities let alone the ultimate obligation.
[Anyanwu v. Anyanwu, 333 N.J.Super. 345, 352, 755 A.2d 656 (App.Div. 2000). (Anyanwu II).]
On February 1, 2001, defendant filed a motion for review of his incarceration based upon what he described as "new evidence." See Marshall v. Matthei, 327 N.J.Super. 512, 527-29, 744 A.2d 209 (App. Div.2000) (noting the right of an individual *677 incarcerated pursuant to R. 1:10-3 to periodic review and interim review based on a threshold showing of a material change of circumstances). In support of his application defendant produced two letters not previously considered in prior hearings.
The first, hereinafter the "Embassy letter," was dated May 11, 1999 on the letterhead of the United States Embassy in Lagos, Nigeria, and was addressed to the Family Part judge then handling the matter.[2] It was signed by Michelle A. Bradford, "Vice Consul" and apparently written in response to a March 12, 1999 order of the judge directing plaintiff's attorney to write to "the proper Nigerian authority" for the following purpose:
[t]o ascertain the determination reached by the village elders with respect to the return of the surviving child and to further determin[e] whether Nigerian culture is such as to prohibit the return of the surviving child, if both parents residing in the United States did seek the return of said child.
The Embassy letter recites that the parties were married according to the Customary law and customs of Imo State in Nigeria on May 26, 1984 and explains under Nigerian law once a "bride price" is paid by the husband, the children and all property of marriage belong to the husband and his extended family. The letter also noted an August 19, 1997 order of the Customary court restraining plaintiff from removing or dealing with the children without consent of the court. Responding to the issue as to what steps can be taken to return Uchechi to the United States, the writer stated somewhat ominously,
All other legal means to either resolve the case or to enforce the subsequent judgment obtained in the High Court of Lagos State and ensure that the surviving child is returned to the United States have failed.
Furthermore, the recent detention of the legal guardian of the children Chris Ohuruogh on account of the death of Ogechi has not helped matters. So far it has been impossible to determine the whereabouts of Uchechi the surviving child. All the efforts of the Embassy and Edith's lawyers have also been to no avail. Edith may have to come home and settle the matter out of court with her husbands' family this will only be entertained if the charges against Longy are dropped and he is released. All in all it is a very difficult situation.
The second letter was unsolicited and sent to the trial judge on January 9, 2001 from Peter N. Njang, hereinafter the "Njang letter," an attorney at law and the executive director of the African Legal and Civil Rights center in Washington, D.C. The letter reads in pertinent part as follows:
I am writing with regard to the Rev. (Dr.) Longy Anyanwu who has been in prison since 1997 for contempt of Court.
....
Rev. Anyanwu is locked up in jail because, it is alleged, he is deliberately keeping the child(ren) of their marriage who were born in the United State back in Nigeria.
We are requesting to know how we can come in to help in this matter. As a guide to Mr. Anyanwu's predicament, we *678 would like to beg the Hon. Judge to throw some light to the matter:
In Nigerian Custom, as well as most African customs, children of a marriage do not belong to the husband and/or wife. Children belong to the two families even if the marriage comes to an end. To Africans, "It takes a village to mold a child". It is never heard of that divorcing couples even mention children. It is taboo! In fact, most Africans never divorce with animosity unless they come to America. Divorce is not strange to Africans, what is strange is fighting over children!
Unfortunately, Rev. Anyanwu is caught between two elephants, the Nigerian Government and the American Government and so he is helpless. Even if he is left in prison for life, those children will not come here until they grow up to be mature to make their own decisions. Whether Rev. Anyanwu he remains in prison or comes out of prison, he cannot forcefully bring those children here to the U.S. If it were not so, what stops the children's mother from going to Nigeria, her country of origin, and to bring the children to the U.S. now that the husband is locked up and has no power to stop her from going to get the children. Ms. Edith Anyanwu's own parents will not allow her to take the children because neither she nor Rev. Anyanwu own those children by themselves. That is our custom, i.e. the African custom.
....
With all due respect, your honor, we pray that you use your right judgment in deciding the fate of a man, who through no fault of his, is left in prison because he has no power over circumstances beyond his control.
Please, we would gladly accept the Court's invitation to testify on the African customs, as it relates to the case at bar....We are not concern with what transpired between Mr. and Mrs. Anyanwu. We are concern with the futility of living Rev. Anyanwu in prison.
The review hearing on defendant's motion was conducted on February 9, 2001. Although both parties were present, neither testified. Mr. Njang faxed a letter to the judge on the hearing date indicating his inability to attend due to a scheduling conflict. The defendant submitted a 128 page pro se brief setting forth his factual allegations in support of his argument that he was unable to comply with the prior orders and should therefore be released. The hearing judge indicated that the Embassy letter and the Njang letter were considered to the extent that they gave defendant support for his conclusion that he was unable to comply with the court orders. Summarizing the arguments of defendant, the judge stated the following:
His position really is that this is a conflict of cultures. Mr. Anyanwu really claims and is of the view that there are contradicting orders from two different courts in two different countries. He indicates that he's Nigerian and does not want to condemn the Nigerian court order or the Nigerian law. He will not violate, he tells me, not only when he was here last time but in his papers, the law he believes in. And he does provide some proof as to some of the things he says, although what he provides is not certified.
The judge then addressed defendant's continued detention and held as follows:
I think the issue can be framed in terms of whether there is substantial likelihood that continued confinement will cause Mr. Anyanwu to change his mind. That's the issue. If the answer *679 is no, then the likelihood of compliance does not exist and incarceration becomes or begins to become punitive, having lost its coercive effect. Bear in mind, he is incarcerated as an inducement or as a measure of coercing him to comply.
So when I frame the issue, that's the law as I understand it. Whether there is a substantial likelihood that continued confinement will cause him to change his mind. And in that regard, even the plaintiff argues to me that his position is the same. He is says the same thing. He's obstinate; he's firm. He doesn't do anything differently than what he said right from the beginning.
He's incarcerated since August 14, 1997. In my view, continued incarceration would no longer be coercive, but would be punitive ... so I'm going to release him from incarceration.
The review hearing conducted fell short of the requirements set forth in prior case law. Catena v. Seidl, 66 N.J. 32, 37, 327 A.2d 658 (1974), held that the contemnor had the burden of proving that continued confinement had no coercive effect and had become punitive. The case required that the burden be satisfied by competent proofs as opposed to ex parte affidavits and reports. Ibid. Factual issues were to be resolved only through live testimony and cross-examination. Ibid.
Subsequently, we stated the following in In re Acceturo, 242 N.J.Super. 281, 290, 576 A.2d 900 (App.Div.1990),
Under no circumstances should the trial judge grant the contemnor's petition for release from custody without affording the [adversary] the opportunity at a hearing to test the veracity and credibility of the proofs offered in support of the petition, as the determination of subjective intent and purpose involves "factual issues that should be resolved only on the basis of live testimony with opportunity for cross-examination." Catena v. Seidl, 66 N.J. 32, 37, 327 A.2d 658 (1974) (Catena II), citing State v. Sherry, 46 N.J. 172, 215 A.2d 536 (1965).
As previously indicated, there was no live testimony presented at the review hearing, and the only new submissions were two unauthenticated letters containing hearsay statements and opinions of uncertain reliability and credibility. The hearing was therefore inadequate, necessitating a remand for a hearing consistent with the requirements of live testimony and competent evidence.
We further hold that the trial judge misapplied the standard for discharge from confinement pursuant to an order of commitment directing compliance with an earlier court order. The trial court's reliance only on the duration of confinement and the perceived refusal of defendant to comply was insufficient to carry the requisite burden of proof and persuasion.
While it is inaccurate to bifurcate the legal concept of contempt into "civil contempt" and "criminal contempt," Dept. of Health v. Roselle, 34 N.J. 331, 169 A.2d 153 (1961); Pressler, Current N.J. Court Rules, R. 1:10, p. 156 (2000), common legal parlance uses the terms to distinguish between coercive measures by a court to force compliance by a recalcitrant party and punitive sanctions to vindicate the authority of the court. Civil contempt is not punitive but remedial to a litigant's right to compel a recalcitrant party to "do what he ought to do." In re Manna, 124 N.J.Super. 428, 438, 307 A.2d 619 (App. Div.), certif. denied, 64 N.J. 158, 313 A.2d 218 (1973). For this reason civil contemnors are said to "carry the keys to the prison in their own pockets." In re Nevitt, 117 F. 448, 461 (8th Cir.1902). Since the legal justification for incarceration for civil contempt is to force compliance, commitment *680 for that purpose cannot continue if it does not have or has lost its coercive power and thereby has become punitive. Catena v. Seidl, 65 N.J. 257, 262, 321 A.2d 225 (1974) (Catena I); Acceturo, supra, 242 N.J.Super. at 287, 576 A.2d 900.
Incarceration obviously loses its coercive power where the party committed is unable to comply with the court order he is charged with violating. Marshall, supra, 327 N.J.Super. at 528-29, 744 A.2d 209. In the instant case, our prior opinions and the decisions of the Family Part judges at review hearings have consistently maintained and explained that defendant is not held in the Morris County Correctional Facility for failure to perform the feat of producing his living child in a New Jersey courthouse. Since 1997 he has been required only to make good faith efforts to comply with orders toward effectuating that result.
Defendant is an educated man and an educator who has demonstrated great ability to understand and communicate concerning legal concepts applicable to his case. He has had the benefit of counsel throughout this travail. Currently, he has one court-appointed attorney to represent him on this matter and another for the New Jersey divorce action brought by plaintiff. It would be fanciful to believe that he does not understand his obligation and the consequences of non-compliance. We concur with the implicit finding of the trial judge that defendant's protestations of inability to perform are disguised and contemptuous refusals of compliance.
The standard for review of commitment status under R. 1:10-3 is whether there is a substantial likelihood that continued incarceration would accomplish the purpose of causing the person confined to comply with the order on which confinement is based. Catena I, supra, 65 N.J. at 263, 321 A.2d 225; Acceturo, supra, 242 N.J.Super. at 287, 576 A.2d 900. The burden is on the person confined to show that the commitment has lost its coercive effect and become punitive. Catena I, supra, 65 N.J. at 263, 321 A.2d 225.
No hard and fast rule or fixed period of time defines when coercive commitment becomes punitive, but refusal to comply is in itself insufficient for a finding that the commitment has lost its coercive power. Catena I, supra, 65 N.J. at 262-63, 321 A.2d 225; Catena v. Seidl, 68 N.J. 224, 229, 343 A.2d 744 (1975). Otherwise the same willful defiance of a lawful order that precipitated the commitment would justify its dissolution and mock rather than vindicate the remedial power of the court. As we said of this defendant previously, he "must accept the consequences of his own choices to defy the trial court's orders rather than comply with their terms." Anyanwu II, supra, 333 N.J.Super. at 354, 755 A.2d 656.
The trilogy of Catena cases is instructive. A suspected member of the hierarchy of organized crime, Gerardo Catena refused to answer questions relating to organized crime before the State Commission of Investigation despite receipt of testimonial immunity. He was cited for contempt and committed to jail until he purged himself by testifying. Catena's intransigence was to the point that he claimed that rather than testify "they'd have to carry me out of there feet first." In three opinions over the ensuing five years the Supreme Court rejected Catena's argument that his continued incarceration had lost its coercive force until the seventy-three year old defendant's health had significantly deteriorated. Even then the Court underscored that refusal of the contemnor to comply over time does not transform the initial commitment into punitive incarceration.

*681 [w]e want to make it perfectly clear that in similar circumstances a person's insistence that he will never talk, or confinement for a particular length of time does not automatically satisfy the requirement of showing "no substantial likelihood." Each case must be decided on an independent evaluation of all of the particular facts. Age, state of health and length of confinement are all factors to be weighed, but the critical question is whether or not further confinement will serve any coercive purpose.
[Catena III, supra, 68 N.J. at 229, 343 A.2d 744.]
Our review of the record of the last review hearing reveals that there was no additional testimony or competent evidence since Anyanwu II to support the trial judge's determination that there exists "no substantial likelihood" of compliance. The decision was based only on the passage of time of several months since Anyanwu II and the unsubstantiated opinion of the hearing judge that defendant would forever remain intransigent. In our view the record does not justify the holding that the standard of "no reasonable likelihood" of compliance was met by defendant's proofs.
Furthermore, we noted in Anyanwu II that there is a subtle difference in reviewing the coercive use of a commitment to uphold a private interest as opposed to a public interest.
The line of civil contempt cases in which persons have been incarcerated for refusal to testify before grand juries and other investigative bodies-regardless of whether the persons were eventually released by the reviewing court or remained incarcerated-have one significant characteristic distinguishing them from cases like this one ... In the instances where only testimony was required, the adversary was the State, and the opposing interest to be vindicated was that of the public's. The courts could more easily determine that the public interest would no longer be served by continued incarceration than we or the trial court can decide for the plaintiff in this matter that her interests no longer require defendant's compliance with the terms of the underlying order. (Citations omitted.)
[Anyanwu II, supra, 333 N.J.Super. at 353, 755 A.2d 656; see also Marshall, supra, 327 N.J.Super. 512, 744 A.2d 209 (holding that the contemnor was not entitled to release from his commitment pursuant to a capias ad satifaciedum).]
Where the plaintiff seeks vindication of her private interest, commitment of the defendant can be viewed as the court's use of "equitable process to enforce judgment ... against a resistive suitor." Federbush v. Federbush, 5 N.J.Super. 107, 112, 68 A.2d 473 (App.Div.1949); Anyanwu II, supra, 333 N.J.Super. at 354, 755 A.2d 656. Since time of confinement is not determinative under R. 1:10-3, the private purpose to be vindicated by continued enforcement is to be considered as well as factors relating to a realistic appraisal of whether there is a "reasonable likelihood" that continued confinement may produce compliance.
Cases in other jurisdictions have recognized that the significance of the order in reviewing continued confinement as an equitable process to enforce a private right. In King v. Department of Social and Health Serv., 110 Wash.2d 793, 756 P.2d 1303 (1988) a children's welfare agency obtained an order directing parents to bring their child to court after receipt of abuse allegations. The child was not produced, and the parents were incarcerated. The mother was released after a finding that she had no information as to the *682 child's whereabouts, but the father remained confined for over a year because of his refusal to disclose the child's location. The Court of Appeals held that the coercive aspect of the order had become secondary to the punitive nature of the father's confinement and ordered his release. The Supreme Court of Washington reversed, holding that the mere passage of time did not convert coercive restraint to punitive contempt and further stated:
In deciding whether a contemnor's incarceration should continue, the trial court should also consider the significance of the ends to be achieved. It is appropriate for the court to balance its interests in enforcing compliance with a particular order a contemnor's liberty.
756 P.2d at 1310. See also Sanders v. Shephard, 163 Ill.2d 534, 206 Ill.Dec. 648, 645 N.E.2d 900 (1994) (affirming denial of motion to vacate order of contempt based on defendant's failure to produce his daughter or disclose her whereabouts and including as factor to be considered the significance of the ends to be achieved by the underlying order); but see Morgan v. Foretich, 564 A.2d 1, 5 n. 2 (D.C.1989) (holding that the significance of order to be enforced should not be considered).
Almost four years have passed since these parties first presented themselves in a New Jersey courtroom. Even a casual observer can see that their lives have gotten much worse and that they have each suffered deeply. One of their children is dead. The other somewhere far away. Their assets are depleted. The defendant lost his job and his liberty. The hostility between them remains unabated. To continue this stalemate solves nothing and assures only that defendant will remain confined for some unspecified time and plaintiff separated from her daughter. It would be naive to assume that defendant would remain within the reach of the court if released. Based on the history of this case, it appears certain that he will go to Nigeria and forever frustrate the plaintiff's search for her child.
Many legal and factual issues remain unresolved. The authenticity and effect of Nigerian court orders are disputed, including whether a valid Nigerian marriage predated the ceremony in the United States. The impact, if any, of Nigerian law and customs has not been explored to any significant extent. And of course the best interest of the child remains unknown.
We do not minimize the challenge this case presents to the hearing judge on remand, especially in light of the highly adversarial posture of the parties. We also recognize that the trial judge is relatively new to the case. We suggest therefore that the judge give consideration to appointment of a guardian ad litem to represent the interests of the child.
The guardian can proceed under the authority of the court and act impartially to report to the court on applicable issues including Nigerian law and customs. The guardian can seek out the assistance of relatives of both parties in the United States and Nigeria to assist in breaking this sad impasse. The guardian would be able to communicate with officials in Nigeria and the United States as a neutral party endeavoring to locate the child and assure the court of her status and well-being. If possible, the guardian could mediate some of the differences between the parties consistent with the best interest of the child. Furthermore, the particularized directive to defendant contained in the January 4, 1998 order must be examined and reformulated to specifically describe the action or actions required of defendant to effectuate compliance and obtain his release. The guardian would be able to assist the court in this respect as well.
*683 In this case the private right to be vindicated and the harm resulting from defendant's non-compliance are obvious and poignant. One child died halfway around the world from her parents. Her mother was unaware both of her location and of her illness. Her father was confined to a jail. If we accept defendant's unsworn statements, the surviving child lives in an unknown place with unknown caretakers and has an uncertain future.
This is not a case of a mobster refusing to testify against criminal cohorts or of enforcement of a support order against a delinquent parent. It is not even about a conflict of cultures or the breadth or limit of judicial enforcement powers. It is about a child.
She has seen her sister die, but she has not seen either of her parents in four years, which in the life of a child can be likened to several lifetimes. While the caption of this case does not mention Uchechi Anyanwu by name, her well-being and best interests must be paramount. It is difficult to conceive of a private right of more significance and more deserving of enforcement than this one.
We have confidence in this trial judge and in the Family Part Bar to approach this troublesome matter with the sensitivity and creativity which it warrants. We believe that there should be periodic progress conferences and hearings in order to resolve this difficult matter as expeditiously as possible.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] The record before us does not contain an order of consolidation of the dissolution action with the domestic violence matter filed the prior year.
[2] While stamped as "received" by the chambers of the Family Part judge previously assigned to the matter, there was no indication that it had been introduced as part of the record considered in any review hearings, or even submitted to counsel. Brought to our attention prior to our decision in Anyanwu II, we stated that "defendant is not in any way constrained from making use of that letter as part of the basis for seeking a new review." Anyanwu, supra, 333 N.J.Super. at 355, 755 A.2d 656.