792 A.2d 525 (2002)
348 N.J. Super. 560
Joel Scott ISAACSON, Plaintiff-Respondent/Cross-Appellant,
v.
Lily ISAACSON, Defendant-Appellant/Cross-Respondent.
Joel Scott Isaacson, Plaintiff-Respondent,
v.
Lily Isaacson, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued December 11, 2001.
Decided March 8, 2002.
*528 Hanan M. Isaacs, Princeton, argued the cause for appellant/cross-respondent (Christine M. Carpenter and Mr. Isaacs, on the brief in A-3519-99T2; Mr. Isaacs, on the brief in A-1861-00T2).
Mark H. Sobel, Roseland, argued the cause for respondent/cross-appellant (Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, attorneys; Mr. Sobel, of counsel in both appeals; Dina M. Vanides, on the brief in both appeals).
Before Judges SKILLMAN, CARCHMAN and WELLS. *526
*527 The opinion of the court was delivered by CARCHMAN, J.A.D.
Two issues dominate in these consolidated appeals from post-judgment orders in the Family Part. The first is whether an attorney appointed as a mediator to resolve ongoing economic disputes between the parties may also serve as a guardian ad litem to represent the interests of the children. While we recognize that the attorney appointed in this litigation provided outstanding service to the litigants, the court and, most important, to the children, we hold that the roles of a court-appointed mediator and guardian ad litem are so inherently incompatible that one individual cannot serve in this dual capacity in the same ongoing litigation.
The second issue concerns the modification of child-support where a parent has received a substantial increase in income, can be classified as a "high-income earner" whose income level exceeds the scope of the Child Support Guidelines and who does not dispute the ability to pay any reasonable amount of child support. We particularly focus on the standards to be applied in considering a modified award, the supporting parent's obligation to provide additional benefits to the children, and the scope of discovery required on such an application. We conclude that the increased award of child support was supported by the record, but the father should provide increased private school costs for the benefit of the children. We further conclude that the judge's restriction of the mother's discovery requests was not an abuse of discretion.
Accordingly, we modify that portion of the February 16, 2000 order allocating 79% of the children's private school tuition *529 and impose the entire obligation of private school tuition on the father and reverse the order of November 15, 2000, denying the mother's application to remove the mediator and guardian ad litem. In all other respects including the award of counsel and expert fees and the denial of a refund of asserted excess child support, the orders of the Family Part are affirmed.
I.
A.
We decide these issues in the following factual and procedural context. Following a twelve year marriage, plaintiff Joel Scott Isaacson ("father" or "plaintiff") and defendant Lily Isaacson ("mother" or "defendant") were divorced by judgment dated January 22, 1996. Two children were born of the marriageRebecca on September 10, 1986, and Sara on June 1, 1989. The judgment incorporated a comprehensive property settlement agreement, which provided that the parties would share legal custody of the children, and defendant would be the primary residential parent. The agreement addressed alimony and child support as well. Among other provisions, the agreement required plaintiff to pay alimony in the amount of $2,600 per month, with the last payment to be made on November 1, 1999. Plaintiff also agreed to pay child support for each child in the amount of $1,200 per month, pay for the children's unreimbursed medical expenses and pay for their summer camp. He also agreed to make additional payments in the amount of $800 per month for the 1996 and 1997 school years to be applied to the girls' private school tuition. The tuition for subsequent years was to be negotiable.
Various post-judgment disputes arose and, by order of December 29, 1997, the judge appointed Judith Hartz, Esq. as mediator and guardian ad litem for the children. The order provided in relevant part:
2. In addition to serving as Guardian ad Litem for the children, Ms. Hartz shall also serve as a binding mediator regarding disputes between plaintiff and defendant. Accordingly, each party shall serve his or her list of disputed issues to Ms. Hartz within two weeks of the entry of the within Order; Ms. Hartz will attempt to mediate the said issues, however, should the parties be unable to agree upon an acceptable solution to an issue, Ms. Hartz will make the decision which shall be binding upon the parties;[1]
....
4. The parties are directed to cooperate with Ms. Hartz, who shall be authorized to report any lack of cooperation to the Court;
....
6. Ms. Hartz shall serve as Guardian ad Litem and mediator until further Order of this Court, however, no party may make an application regarding the continuation/discontinuation of Ms. Hartz as a mediator until March 9, 1998, unless good cause shown[.]
*530 During the next few years, Hartz apparently successfully resolved, through the mediation process, various disputes between the parties. Included in these disputes were resolution of responsibility for the cost of school tuition, the installation of a teen telephone and payments for Rebecca's Bat Mitzvah. Additionally, in her role as guardian ad litem, Hartz consulted with the children and the parties to resolve parenting time and other related problems.
Given the contentiousness of the parties, not surprisingly, issues arose regarding the children's willingness to spend time with plaintiff and their attendance at therapy sessions. Hartz, in her role as guardian ad litem, aggressively intervened in support of the children and in the process reached conclusions regarding defendant's involvement and cooperation, or lack thereof, regarding such issues. Hartz viewed her role as dynamic and proactive, and she properly forwarded to the trial judge reports concerning the children and the issues in dispute. As guardian ad litem, she assessed the factual circumstances surrounding these issues, as she perceived them, and in some instances, criticized defendant's conduct and cooperation. The result of such reports was predictable as defendant asserted that Hartz was biased against her, ultimately resulting in defendant's application seeking Hartz's removal as both mediator and guardian ad litem. Hartz then voluntarily suspended her function as mediator.
Subsequent proceedings, with Hartz presumably acting in her role as guardian ad litem, provided stimuli to defendant's complaints about Hartz's dual role. At one point, Hartz presented an order to show cause seeking to compel the parties to undergo psychological evaluations and family therapy, as well as other relief with respect to the interests of the children. Hartz asserted that defendant was no longer acting in the children's best interests. In opposing the order to show cause, defendant alleged that Hartz had revealed confidential information to the judge that had been obtained by speaking to the therapist for one of the daughters, that Hartz had not met with either daughter since June 2000, that both girls were doing well academically and socially, and that Hartz was acting as the father's advocate and spoke to him frequently outside of wife's presence. Defendant claimed that the children perceived Hartz as being totally aligned with plaintiff; moreover, defendant alleged that Hartz was biased against her. On the return date of the order to show cause, the judge discussed issues relating to the denial of plaintiff's access to his children and, significantly, instructed defendant that he had no intention of removing Hartz as guardian ad litem and mediator.
B.
While the ongoing disputes regarding parenting time were being pursued, defendant sought financial relief as well. In September 1999, several months before defendant's alimony was due to terminate, she filed a motion seeking increased child support. In support of this motion, she alleged that she had demonstrated changed circumstances as a result of the substantial positive change in plaintiff's financial situation. That is, she claimed that, at the time of the divorce in 1996, she was unemployed and plaintiff earned approximately $180,000 per year. As of the date of the motion, defendant was employed and earning approximately $50,000 per year, while plaintiff's income had increased to more than $500,000 per year. She further claimed that, with the pending termination of her alimony, she could no longer afford to support the two children on only $2,400 per month.
*531 Although apparent attempts were made by the parties to resolve the economic issues, disputes arose as to the quantum of financial information made available by plaintiff regarding his income and other assets. Plaintiff, a Certified Public Accountant, was the chief executive officer of a successful financial services firm, which was incorporated as a sub-chapter "S" corporation. There were four principals in the firm. Significantly, the company was subject to a regular Securities and Exchange Commission (SEC) balance sheet audit performed by an independent certified public accountant.
During the pendency of defendant's application, issues arose as to the scope of discovery. Plaintiff initially provided his 1998 W-2 form and his 1997 personal income tax return. Defendant retained a forensic accountant who requested substantial documentation including not only plaintiff's personal and business tax returns, but 1998 and 1999 bank statements on all business accounts, 1998 and 1999 purchase invoices, canceled checks, time and billing records, accounts receivable records, a pay stub dated December 31, 1998, his three most recent pay stubs, and current statements for all his investment accounts.
The judge observed that he had been familiar with this litigation for six years, plaintiff was involved in a business that was subject to regular scrutiny by the SEC, and this post-judgment application did not require the in-depth discovery sought by defendant. The judge ordered that plaintiff produce his 1998 business and personal tax returns as well as a certified statement as to his anticipated 1999 earnings. Plaintiff offered that his income had increased dramatically to a sum in excess of $500,000, and his 1999 income would be within five to ten percent of his 1998 income of $536,000. In fact, he thereafter filed an affidavit indicating his 1999 income, including add-backs, was $554,750.
Most significantly, plaintiff conceded that he could pay any amount of child support ordered by the judge. Equally as significant, defendant failed to make any showing either through her forensic accountant or otherwise that the income figures provided by plaintiff were subject to further dispute or that additional discovery would reveal anything more to enhance defendant's entitlement to additional child support beyond the amount that she sought on her application. Moreover, neither defendant nor her expert challenged the premise of the judge's determination that plaintiff's income was subject to scrutiny by governmental agencies obviating the necessity for further inquiry. The judge noted that since there was no significant dispute as to plaintiff's income, it was unnecessary "to spend $15,000 to $20,000 on discovery" just to get increased child support. Lastly, defendant's demands for increased child support were relatively modest, and defendant did not suggest, in any meaningful way, that plaintiff's lifestyle had significantly changed or that he was living in a manner or mode that was significantly disparate from that of his children. Plaintiff had remarried and fathered another child, but nothing before the motion judge suggested that this child, albeit an infant, was treated in a manner materially or substantially different from that of plaintiff's older children who were the subject of this application.
Defendant also sought an increase in plaintiff's contribution to the children's private school expenses. In December 1997, prior to the motion for an increase in child support, the parties, with Hartz as the mediator, had successfully mediated an agreement that called for plaintiff to pay for 79% of the children's private school tuition and 100% of their summer camp *532 costs. This amounted to additional payments by plaintiff each year of $12,000 for school and $11,000 for camp. Plaintiff also spent about $4,000 per year for the children's health insurance and $3,000 per year for orthodontics. He also took them on vacation and incurred other visitation expenses, although his present relationship with the children was in issue.
Although allusions were made to the general rule of relevance of the parties' present lifestyle, defendant focused her efforts on discovery of plaintiff's personal and corporate income. The judge refused to require husband to provide an updated case information statement (CIS). That is, according to the judge, only if plaintiff argued that he could not afford to pay for something would the judge require him to submit a CIS. The judge also disagreed with defendant's argument that plaintiff's investment income was relevant. Rather, according to the motion judge, such income became relevant only when a spouse's earned income was insufficient to pay for child support.[2] The judge ordered defendant to isolate the children's monthly expenses so that their needs could be determined, since it was not assumed to be pro rata. Defendant's allocation of expenses were of particular significance because she had submitted a CIS in 1994, when she was unemployed, listing monthly expenses for herself and the children at $11,060. In July 1999, while the parties were in negotiation, she presented a CIS setting forth monthly expenses in excess of $16,000. Significantly, the CIS filed in support of her December 1999 motion for increased child support listed expenses for defendant and the children at $9,376, apparently $1,700 less than her 1994 expenses. The judge indicated that if the parties did not agree on an amount for child support, he would determine the appropriate amount, not to "fill[] the hole that the alimony loss has caused," but to focus primarily on the maturation of the children and plaintiff's increase in income.
The judge ordered temporary child support of $5,000 per month pending final hearing, and at final hearing ordered plaintiff to pay total child support in the amount of $3,500 per month or $42,000 per year, tax free, allocated equally between the two girls. The judge rejected defendant's argument that because plaintiff's income had tripled, his child support obligation should triple. The judge instead considered the maturation of the children and the standard of living and economic circumstances of both spouses. Defendant, in particular, was more financially self-sufficient than she had been at the time of the divorce, and the total amount of money now available to her was almost equal to what she had before she earned any money on her own. The judge maintained plaintiff's responsibility for private school tuition at 79% because plaintiff would be absorbing greater educational expenses for the children as they matured.
In rejecting defendant's theory that she was entitled to support based on a percentage of plaintiff's income, the judge noted that at the time of the divorce, defendant had negotiated a limited period of alimony, inferring that when plaintiff had agreed to pay one-third of his income in support, he had "frontloaded" the negotiation, that is, agreed to pay limited increased support so that he would receive financial relief when defendant became financially independent, and her alimony terminated. That event had now come to pass.
*533 The judge did not dwell on defendant's overstatement of her expenses because the child support guidelines "don't care about expenses ... in the first level," noting that he was not extrapolating income, merely supplementing it, and that he was giving the children:
[S]ome other advantages that they ordinarily wouldn't have. You know, sleep away camp is not a given to every child in America....
The same thing with the private schooling. This is above and beyond, I think, what many children would be able to have available to them. So this is intended, this $42,000, for their basic support, which I think is moreI shouldn't say more, but I think meets the needs of the children. This is not intended to meet [defendant's] needs. It is not an alimony replacement. I made that clear from the beginning.
The judge also noted that the maximum amount of child support set forth in the guidelines was $650 per week for two children, or $34,000 per year, and that this figure was based on net family income of $2,900 per week, or $225,000 of gross income per year. Here, however, without even considering defendant's income of $50,000, the judge had ordered husband to pay $8,000 per year more than the maximum in the guidelines. He stated that child support awards were never intended to "pyramid all the way out" just because a husband earned several times more than the maximum set forth in the guidelines. He made the award retroactive to the termination of alimonyDecember 1999.
When the parties pointed out that plaintiff had temporarily been paying wife $5,000 per month since their last court appearance, the judge noted that he did not intend for defendant to have to owe money to plaintiff. Plaintiff's counsel then stated, "Judge, I'll volunteer to let that go."
II.
We first address the issue of whether the same individual may serve as guardian ad litem and mediator, and if disqualified as a mediator, whether the individual may continue to serve as guardian ad litem.
We commence our analysis with a review of the enabling rules regarding both positions. R. 5:8B(a) permits the discretionary appointment by a judge of a guardian ad litem in a dispute between the parties as to custody and parenting time. The relevant portions of the rule provide:
In all cases in which custody or parenting time/visitation is an issue, a guardian ad litem may be appointed by court order to represent the best interests of the child or children if the circumstances warrant such an appointment. The services rendered by a guardian ad litem shall be to the court on behalf of the child. A guardian ad litem may be appointed by the court on its own motion or on application of either or both of the parents. The guardian ad litem shall file a written report with the court setting forth findings and recommendations and the basis thereof, and shall be available to testify and shall be subject to cross-examination thereon. In addition to the preparation of a written report and the obligation to testify and be cross-examined thereon, the duties of a guardian may include, but need not be limited to, the following:
1. Interviewing the children and parties.
2. Interviewing other persons possessing relevant information.
3. Obtaining relevant documentary evidence.
*534 4. Conferring with counsel for the parties.
5. Conferring with the court, on notice to counsel.
6. Obtaining the assistance of independent experts, on leave of court.
7. Obtaining the assistance of a lawyer for the child (R. 5:8A) on leave of court.
8. Such other matters as the guardian ad litem may request, on leave of court.

[R. 5:8B.]
The guardian ad litem acts on behalf of the court for the benefit of the child and serves as an independent factfinder, investigator, and evaluator of what furthers the best interests of the child. See Pressler, Current N.J. Court Rules, comment on R. 5:8B (2002).
A mediator is also enabled by court rule. See R. 1:40. Mediation is particularly appropriate and is mandated in custody and mediation cases. R. 1:40-5(a) (requiring submission of custody and parenting time issues to mediation). The rules, however, recognize that a custody or visitation mediator may not subsequently act as an evaluator for any court-ordered report or make any recommendation to the court respecting custody or visitation. R. 1:40-5(c).
Although Hartz was appointed as an economic mediator as opposed to one addressing issues of custody and parenting time, certain general considerations apply to all mediators. Most critical to our analysis here is the requirement of confidentiality. "[N]o disclosure made by a party during any mediation process shall be admitted as evidence against that party in any civil, criminal, or quasi-criminal proceeding," and "[n]o mediator may participate in any subsequent hearing or trial of the mediated matter or appear as witness or counsel for any person in the same or any related matter." R. 1:40-4(c).
A practical reading of the rules and common sense application precludes the dual role served by Hartz in this case. Critical to a mediator's role is the ability to instill the trust and confidence of the participants in the mediation process. That confidence is insured if the participants trust that information conveyed to the mediator will remain in confidence. Neutrality is the essence of the mediation process. The rule itself embodies a fail-safe provision permitting termination where party challenges the impartiality of the mediator. See R. 1:40-4(f)(1)(B).
We are not persuaded that the language limiting the role of Hartz as mediator to mediate economic issues and her role as guardian ad litem to protect the best interests of the children presents a defining distinction allowing her to serve in both capacities. Despite the seeming disparate nature of the roles, they were not so distinct as to avoid the necessary overlap generating the conflict.
An examination of some of the issues resolved in mediation serves to illustrate the point. The issues of school tuition, telephone service for the children and Bat Mitzvah expenses all involved both the objective elements of cost and entitlement but also implicated the more subjective consideration of the children's best interests. The record reveals petulant correspondence between one of the children and plaintiff complaining about the plaintiff's failure to contribute to certain Bat Mitzvah functions. If not resolved by the parties, ultimately the issue would be before the court and involved input from Hartz, not as mediator, but as guardian ad litem. If the judge had requested her input on this or any other similar issue, the conflict between her role as the court's appointee to serve the best interests of the child and *535 the bar against a mediator participating as a witness in any related matter would be palpably apparent. Compare R. 1:40-4(c) (precluding a mediator from participating as a witness for any person in a related matter) with R. 5:8B(a) (mandating that a guardian ad litem shall be available to testify). We recognize that the judge and even the parties may have viewed Hartz's dual role as distinct, but clearly they were so inextricably intertwined as to place her in an untenable position.
Hartz herself recognized that once defendant accused her of bias, her role as mediator had been compromised. We deem it appropriate to reflect that our review of the record demonstrates no "bias" by Hartz against defendant, but ultimately that is besides the point. The positions are so inherently conflicting that fulfillment of one role necessarily precludes serving in the other.
We reject the view that our decision in Anyanwu v. Anyanwu, 339 N.J.Super. 278, 771 A.2d 672 (App.Div.), certif. denied, 170 N.J. 388, 788 A.2d 773 (2001), sanctions the dual appointment in issue here. In Anyanwu, we suggested that on remand, the judge consider the appointment of a guardian ad litem and then noted, "[i]f possible, the guardian could mediate some of the differences between the parties consistent with the best interest of the child." Id. at 294, 771 A.2d 672. Our prompting was not for the dual appointment in issue here but a recognition that a guardian ad litem`s insight might permit the parties to resolve issues between themselves. See, e.g., Gyimoty v. Gyimoty, 319 N.J.Super. 544, 546-47, 725 A.2d 1189 (Ch.Div.1998) (noting that the mediator recommended the appointment of a guardian ad litem; the guardian ad litem's report then provided assistance to the parties in resolving issues in dispute). The ability of a guardian ad litem to fulfill her factfinding role may help facilitate the parties to resolve some of their differences in an amicable manner. This by-product of a guardian ad litem`s efforts is ancillary to the guardian ad litem`s primary obligation to the court and to the children. This is what we spoke to in Anyanwu and is distinctly different from the dual appointment here.
The conflict we address on this appeal was presaged. In its report to the Supreme Court recommending the adoption of R. 5:8B, the Family Division Practice Committee commented that if a proposed guardian ad litem "undertakes mediation as well, that function may compromise the fact finding role [of the guardian ad litem ] itself." Annual Report of the Family Division Practice Committee, 102 (1987-1988). That conflict is most apparent in this case where the focused attention of Hartz to fulfill her role as guardian ad litem and her dual capacity as mediator placed her in the inevitable position of presenting to the court her findings, which by their very nature challenged defendant's factual assertions as to the relationship between plaintiff and his daughters. By correctly asserting herself and fulfilling her fact-finding role, Hartz's position as a mediator was undermined.
Our discussion regarding the inherent conflict between a mediator and guardian ad litem easily answers the question as to whether Hartz can remain in either capacity. The mediation process includes the ability of the mediator to be privy to confidential matters that cannot be then presented to the court. Defendant asserts that she has dealt with Hartz in such a manner and has shared confidential information. The inherent conflict between a mediator's obligation to respect the confidences of the parties and her concomitant responsibility as guardian ad litem to serve as an officer of the court in the *536 interests of the children precludes the same individual from serving in both roles.
We deem it inappropriate to make further inquiry into the nature of such communications or whether such communications actually found their way to the judge. We conclude that Hartz can no longer serve as either mediator or guardian ad litem and hold that one individual should not be appointed to serve in the two roles in the same case. We reach this conclusion recognizing that apparently Hartz has not only been an effective mediator, but from our reading of this extensive record, well-served the best interests of the court and, most importantly, the children. Ultimately, all involved in this litigationthe parties, the children and the courtwill suffer from her relinquishing her role in this litigation, but we see no other appropriate alternative.
We are compelled to comment on an issue raised by defendant that Hartz somehow acted inappropriately in communicating with the experts or forwarding reports to the court. Both assertions are devoid of any merit. Hartz served the court for the best interests of the children. She was specifically charged by rule with "interviewing other persons possessing relevant information," R. 5:8B(a)(2), as well as providing reports to the court. Her contact with health professionals was well within the scope of her authority, and her reports to the court with notice to the parties clearly within her responsibility as guardian ad litem.
Lastly, defendant suggests that we not order the appointment of another guardian ad litem. That determination will be made by the trial judge on application of the parties. We do note that unless circumstances have changed since the pendency of this appeal, the appointment of a guardian ad litem appears to be appropriate. The contentious relationship of the parties and the impact of such relationships on the children appear to warrant such an appointment.
We do not, by recognizing the conflict between an appointed mediator and guardian ad litem, deprecate the role of either. Both serve purposes critical to the administration of justice in the Family Part and represent innovative and expansive methodologies necessary to insure prompt and appropriate resolution of critical issues. The mediation process provides a vehicle for allowing the parties to resolve disputes between themselves on issues beyond visitation and parenting including, as was proposed by the trial judge here, economic issues.[3]
A mediator and guardian ad litem are both critical to the administration of justice in the Family Part. We conclude, however, that the roles are inherently conflicting and the same individual may not serve in both capacities.
III.
We now address the economic issues raised on appeal. Our analysis of the increased child support award must begin with a brief restatement of certain *537 applicable principles of law. Orders for support "may be revised and altered by the court from time to time as circumstances may require." N.J.S.A. 2A:34-23. Upon a motion to modify child support, the moving party has the burden to make a prima facie showing of changed circumstances warranting relief. Only if such a showing is made does the court have the right to order full discovery regarding the financial circumstances of the other spouse. See Lepis v. Lepis, 83 N.J. 139, 157, 416 A.2d 45 (1980); Dorfman v. Dorfman, 315 N.J.Super. 511, 515, 719 A.2d 178 (App.Div.1998). A plenary hearing is necessary to adjudicate the matter only if there are genuine issues of material fact. Lepis, supra, 83 N.J. at 159, 416 A.2d 45; Dorfman, supra, 315 N.J.Super. at 515, 719 A.2d 178.
The parties agreed that defendant met her burden of proving changed circumstances. While she asserted the maturation of the children as one changed circumstance, the more precise basis for her motion was not only the maturation of the children, but the substantial increase in plaintiff's income, an increase that plaintiff did not dispute. Plaintiff conceded that his annual income had increased from $180,000 at the time of the divorce to over $500,000 at the time of the motion. Defendant's income had increased in that same period from zero to $50,000.
We have generally recognized that where the parties have the financial wherewithal to provide for their children, the children are entitled to the benefit of financial advantages available to them. We have characterized such circumstances as reflecting a parent's "good fortune" and have held that children are entitled to have their needs accord with the current standard of living of both parents, which may reflect an increase in parental good fortune. See Connell v. Connell, 313 N.J.Super. 426, 430, 712 A.2d 1266 (App.Div. 1998); Italiano v. Rudkin (Italiano), 294 N.J.Super. 502, 506, 683 A.2d 854 (App. Div.1996); Koelble v. Koelble, 261 N.J.Super. 190, 193, 618 A.2d 377 (App.Div.1992); Walton v. Visgil, 248 N.J.Super. 642, 649, 591 A.2d 1018 (App.Div.1991); Zazzo v. Zazzo, 245 N.J.Super. 124, 130, 584 A.2d 281 (App.Div.1990), certif. denied, 126 N.J. 321, 598 A.2d 881 (1991). Children are entitled to not only bare necessities, but a supporting parent has the obligation to share with his children the benefit of his financial achievement. See Dunne v. Dunne, 209 N.J.Super. 559, 567, 508 A.2d 273 (App.Div.1986).
We need not define the parameters of "good fortune," except to observe that recent economic prosperity has spawned parents whose income far exceeds the norm and who can be characterized as "high earners." For the purposes of our inquiry, we include in such category those earners whose wage level substantially exceeds the child support guidelines and who, for all intents and purposes, can, without dispute, afford any rationally based award of increased child support.
Any increase in a child support award must be made after consideration of the relevant statutory criteria for such award pursuant to N.J.S.A. 2A:34-23(a).[4] *538 The parties recognized that the income levels in issue here exceeded the maximum child support guidelines. In such circumstances, the maximum amount provided for in the guidelines should be "supplemented" by an additional award determined through application of the statutory factors in N.J.S.A. 2A:34-23(a). See Pascale v. Pascale, 140 N.J. 583, 594-95, 660 A.2d 485 (1995); Connell, supra, 313 N.J.Super. at 431, 712 A.2d 1266. However, a judge should not extrapolate above the threshold using the respective percentages of total combined net income because extrapolation undermines the statistical basis of the guidelines. See Pascale, supra, 140 N.J. at 593, 660 A.2d 485; Connell, supra, 313 N.J.Super. at 431, 712 A.2d 1266; see also Pressler, Current N.J. Court Rules, Appendix IX A to R. 5:6A, at 2280-81 (2002) (noting that because estimates on marginal cost of children in intact families with net incomes of more than $150,800 per year are unreliable or unavailable, judges should not extrapolate, either statistically or by adding amounts from different income ranges).
Where our attention is focused on the unique circumstances of the high-income earner whose ability to pay increased child support is not in issue, the dominant guideline for consideration is the reasonable needs of the children, which must be addressed in the context of the standard of living of the parties. The needs of the children must be the centerpiece of any relevant analysis. Other economic-dependant factors are of less significance, as the high earner's concession of ability to pay has essentially limited the consideration of such economic-dependent issues. However, any consideration of needs must factor in the age and health of the children, as well as the other assets or income of the children, including any debts. Obviously, when considering the age factor, the needs of an infant child are distinctly different from the needs of teenage children, as is the case here.[5]
Determining a child's needs in these unusual financial circumstances presents unique problems. First, a balance must be struck between reasonable needs, which reflect lifestyle opportunities, while at the same time precluding an inappropriate windfall to the child or even in some cases infringing on the legitimate right of either parent to determine the appropriate lifestyle of a child. See Laura W. Morgan, Child Support and the Anomalous Case of the High-Income and Low-Income Parent: The Need to Reconsider What Constitutes "Support" in the American and Canadian Child Support Guideline Models, 13 Can. J. Fam. L. 161, 195 (1996). This latter consideration involves a careful balancing of interests reflecting that a child's entitlement to share in a parent's good *539 fortune does not deprive either parent of the right to participate in the development of an appropriate value system for a child. This is a critical tension that may develop between competing parents. Ultimately, the needs of a child in such circumstances also calls to the fore the best interests of a child.
We have suggested that "`needs' accord with the current standard of living of both parents, which may reflect an increase in parental good fortune." Zazzo, supra, 245 N.J.Super. at 130, 584 A.2d 281. We have also recognized that after basic needs are met and a parent's income permits, children are entitled to other non-essential items that are reasonable and in the child's best interest. See Dunne, supra, 209 N.J.Super. at 567-68, 508 A.2d 273. We have expounded on examples of sharing in a parents good fortune in Walton, where we noted:
In the future, where as here, the children are entitled to share in a parent's good fortune, the custodial parent's budget should be broken down into two parts: the reality-based component dictated by his or her income and the added projections which will, in fact, allow the children to share in the other parent's financial gain. This could include, by way of example, private school tuition, private tutoring, summer camps, music or art lessons, sports clinics, vacations, study abroad, and the provision of transportation for a child who drives, to mention only a few possibilities. It could also include help to make the family home more presentable, assistance with the cost of a family car, or a larger amount of money for a teenager's clothing and incidentals. As we have said, these are only examples. What is important is that sufficient thought, effort and information is put into the two-part budget to give the trial judge a basis on which to act under Dunne and Zazzo. [248 N.J.Super. at 650-51, 591 A.2d 1018.]
The examples expressed in Walton, which like Zazzo and Dunne is not a case involving a high-income earner as we have defined the term, do not provide an exhaustive list of opportunities for a child to share in a parent's good fortune. Yet, the promulgation of such "needs" is not an open-ended opportunity for a parent to develop a "wish-list" for a child that does not comport with the child's best interests; "needs" is a relative factor in appropriate upbringing of a child and a reflection of the lifestyle of the parents. By way of example, the fact that a parent may be driving a luxury automobile does not mean that a child of driving age will be entitled to a similar luxury automobile, but the supporting parent's financial wherewithal may enable a child with a need for an automobile to enjoy the luxury of an automobile, suitable and appropriate for a teen-age driver and sufficient to meet the child's transportation needs. Judges must be vigilant in providing for "needs" consistent with lifestyle without overindulgence. As one court observed in dealing with high income support, "[p]ractitioners dealing with situations such as this sometimes refer to the `Three Pony Rule.' That is, no child, no matter how wealthy the parents, needs to be provided more than three ponies." In re Patterson, 22 Kan.App.2d 522, 920 P.2d. 450, 455 (1996).[6]
*540 Other jurisdictions have addressed this important distinction between needs commensurate with lifestyle and overindulgence. For example, in Miller v. Schou, 616 So.2d 436, 437-38 (Fla.1993), the Florida Supreme Court recognized that a child has every right to share in the good fortune of his or her parents, however, this entitlement is tempered by the needs of the child in determining an appropriate amount of support. The Court noted "we do not mean to imply that the child of a multimillionaire should be awarded enough support to be driven to school each day in a chauffeured limousine.... The child is only entitled to share in the good fortune of his parent consistent with an appropriate lifestyle." Id. at 438-439; see also Branch v. Jackson, 427 Pa.Super. 417, 629 A.2d 170, 171 (1993) (noting that while a child is entitled to the lifestyle commensurate with a supporting parent's income, the child was not entitled to all the luxuries available; the supporting parent still has the right to participate in the upbringing of the child and limit expenses to the reasonable needs of the child of a wealthy parent); Hanley M. Gurwin, Child Support in High Income Cases, How Much is Too Much?, 79 Mich. B.J. 186, 187 (2000).
These financial circumstances do not relieve the judge of the obligation to balance needs and opportunity to satisfy those needs. Sharing good fortune does not absolve the parties or a judge of determining needs of a child in a sensible manner consistent with the best interests of the child. What has been eliminated from the equation is ability to pay and the opportunity to satisfy needs and values without the specter and concern of worrying where the funds will come from.
We also recognize, as we have done in the past, that the law is not offended if there is some incidental benefit to the custodial parent from increased child support payments. See Zazzo, supra, 245 N.J.Super. at 131, 584 A.2d 281. As we noted in Walton:
In short, we see no reason why, because of their mother's impecuniousness, these children of a very successful father should be required to live in a house which is in a state of disrepair, be transported in an old or unreliable vehicle or go without a necessary new furnace. Their father's income entitles them to better, and the fact that their mother may benefit incidentally from the component for which the father pays is of no moment.
[248 N.J.Super. at 650, 591 A.2d 1018 (citing Zazzo, supra, 245 N.J.Super. at 131, 584 A.2d 281).]
This, too, requires the judge to balance the needs of the child. Incidental benefit is not offensive, but overreaching in the name of benefitting a child is. To expand on the analogy set forth in Walton, we can easily perceive different considerations of incidental benefit applying where an application for increased child support including repairs to a home is made when the child is approaching majority, as opposed to such an application where the child or children are younger. A custodial parent seeking an increase in child support to provide for adequate transportation for children when the children are young and not of driving age is decidedly different than an application made when the child is seventeen years old. These, too, are factors which must be considered by the judge. Judges, of course, must be conscious that in balancing the award with the *541 incidental benefit to the custodial parent, the lifestyle of the supporting and custodial parent may be so disparate that a disconnect between financial resources available to a child and the lack of similar resources available to a custodial parent may generate other issues. We need not address this issue here, as the difference in lifestyle between the plaintiff and defendant is not so disparate so as to crystalize the issue.
We now briefly address the issue of discovery. Defendant was entitled to plaintiff's tax returns and other pertinent financial information. See Lepis, supra, 83 N.J. at 157, 416 A.2d 45. "[W]ithout access to such reliable indicia of the supporting spouse's financial ability, the movant may be unable to prove that modification is warranted." Id. at 157-58, 416 A.2d 45. Here, it was conceded by plaintiff that modification was warranted; the only question was the amount. The judge properly ordered husband to submit both his personal and business tax returns for the two prior years and to certify to his current level of income. Defendant contends that plaintiff should have been required to provide more, including access to the books of his closely held corporation. This was not a motion to reassess equitable distribution based on fraudulent disclosure, of. Rolnick v. Rolnick, 262 N.J.Super. 343, 362-63, 621 A.2d 37 (App.Div. 1993), and there was no allegation of concealment of income. Rather, defendant simply asserted that she did not trust plaintiff and that, as the owner of a closely held corporation, plaintiff "must" have been receiving more income than he was declaring on his tax returns. Finally, this was not a case where defendant suggested that plaintiff's lifestyle was so disparate from hers or the children that further inquiry was necessary.
Acknowledging that even though plaintiff did not challenge his ability to pay any reasonable amount of child support, and his lifestyle was not in material dispute, we deem the quantum of discovery on modification applications to be governed by proper application of discretion by the motion judge. We disagree with the judge's refusal to require plaintiff to produce a CIS as ordinarily such a statement is necessary for the judge to have full appreciation of asset structure and lifestyle. Where such issues are in dispute, absent compelling reasons, a CIS should be filed by a responding party once the moving party has established a prima facie case warranting the motion to proceed.
We recognize that in high income cases, discovery resulting in production of tax returns and personal financial statements may become not an exercise in discovery but a weapon to embarrass the high earner. See Thomas Paine Dunlap and Lawrence E. Leone, Children of Fortune, 23 Los Angeles Lawyer 37 (April 2000) (describing the "nightmare" of a post-hearing press conference highlighting copies of a high-income entertainer's tax return and financial information).
To resolve this relevant tension but insure that a judge has appropriate information on which to properly assess child support, California has adopted the "least beneficial assumption" test. See Estevez v. Superior Court, 22 Cal.App. 4th 423, 27 Cal.Rptr.2d 470, 475-76 (1994). Estevez addressed the question of whether the court may preclude discovery of the net worth and lifestyle of a non-custodial parent where there is no question as to that parent's ability to pay any reasonable support order. On application to modify a prior child support order, Estevez was served with a request for production and inspection of numerous documents and other tangible items including bank records, *542 income records, W 2 forms, brokerage accounts and documentation of his monthly expenses. In response, he stipulated that for each of the years in question, he had a gross income of not less than $1.4 million per year, his current gross income was commensurate with those years, and that he would accede to any order the court may make, even in excess of the guideline formula, so long as the award addressed the reasonable needs of the children commensurate with his status as an extraordinarily high earner. The court found:
evidence of detailed lifestyle and net worth to be relevant only in those situations where the ability of the non-custodial parent to make adequate support payments may be affected by the unwise expenditure of income to the detriment of the supported minor. Where there is no question of the non-custodial parent's ability to pay any reasonable support order, we conclude that evidence of detailed lifestyle to be irrelevant to the issue of the amount of support to be paid and thus protected from discovery and inadmissible in determining the support order.

[Id. at 474 (quoting White v. Marciano, 190 Cal.App.3d 1026, 235 Cal.Rptr. 779, 782 (1987)).]
The court then determined "where the extraordinarily high earner resists detailed discovery of his or her financial affairs, the trial court may make such assumptions concerning his or her net disposable income, federal income tax filing status, and deductions from gross income as are least beneficial to the extraordinarily high earner...." Id. at 475-76.
In Johnson v. Superior Court, 66 Cal.App. 4th 68, 77 Cal.Rptr.2d 624, 628 (1998), the court adopted the holding of Estevez but changed the nature of the "least beneficial assumption" test from permissive to mandatory and addressed how these assumptions are to be made. In Johnson, which involved a similar factual scenario to that of Estevez, the court stated that the least beneficial assumptions
cannot be made in a vacuum but must be based on reason. The key financial factor in the guideline formula is net disposable income. We see no particular impediment to the trial court's ability to make least favorable assumptions on the liability side of the net income equation. The more formidable challenge will be to make reasonable assumptions as to gross income.

[Id. at 628.]
The court remanded to the lower court the issue of discovery, holding that if assumptions unfavorable to Johnson may reasonably be made in the absence of any discovery, no discovery should be granted, yet, if the information available is insufficient to make such assumptions, some form of limited discovery should be granted. Id. at 629. Of course, although not specifically addressed in Estevez or Johnson, appropriate protective orders may be employed to protect against such disclosure.
We have determined that at a minimum, to determine lifestyle, if in issue, and income, a supporting parent should provide income tax returns as well as a CIS, which will reflect additional sources of income. On receipt of that information, a judge is entitled to make "least beneficial assumptions" as to the lifestyle of the responding parent. The lifestyle issue need not be the subject of expansive or expensive discovery. The judge need only consider that a parent at a certain level of income is assumed to live a lifestyle commensurate with that income. This avoids the problem presented by the high-income earner who chooses to live in an excessively penurious lifestyle as opposed to one who chooses to live consistent with such *543 income. We deem the application of this rule as one which will expedite and simplify the proceedings rather than one which will cause expanded and, in many cases, unnecessary time and cost to the litigants and the court. Again, we reiterate that the lifestyle consideration is one factor to be considered with the needs and best interest of the child consistent with the ability of parents to instill values that may be, at some point, inconsistent with the ability to afford anything that the child, or custodial parent, may desire. Under the circumstances presented here, however, we deem the judge's denial of defendant's request for plaintiff's CIS to be harmless for, as we have indicated, neither his ability to pay nor lifestyle was in significant or material dispute. Certainly, where other financial issues are legitimately in issue and directly relevant to the issue of child support, additional discovery may be ordered as the judge deems appropriate.
Applying the factors that we have described, we find no error in the base amount of the modification from $2,400 per month in child support to $3,500 per month in child support. We have carefully scrutinized the record and conclude that the award was not an abuse of the judge's discretion. See Foust v. Glaser, 340 N.J.Super. 312, 315-16, 774 A.2d 581 (App. Div.2001); Raynor v. Raynor, 319 N.J.Super. 591, 605, 726 A.2d 280 (App.Div.1999) (noting that child support awards should not be overturned unless they are manifestly arbitrary, unreasonable or contrary to the evidence). We take particular note that other than to state that she needed the additional money to meet her household expenses, defendant did not articulate in her motion the children's needs that were not being satisfied absent the increased child support. Furthermore, she failed to provide the requisite "breakout" of the children's expenses as we urged in Walton. See 248 N.J.Super. at 650-51, 591 A.2d 1018.
Plaintiff is not only required to pay $3,500 per month in child support, but also private school expenses, camp expenses, unreimbursed medical expenses, future educational expenses, as well as those expenses that may normally be associated with vacations and related visitation expenses assuming a thawing of the relationship between plaintiff and the children. We recognize that this support obligation substantially exceeds the $42,000 per year base amount ordered by the judge.
We also agree with the trial judge's rejection of a percentage increase in support based on the percentage increase in income. The judge noted that, especially where very high income levels are involved, child support awards are not intended to increase at the same rate as an increase in a parent's income. See Pressler, Current N.J. Court Rules, Appendix IX-A to R. 5:6A at 2264 (2002) (noting that as household income increases, expenditures on children as proportion of family income decreases).
We do, however, disagree as to an element of support in an issue on appeal, that is, the cost of private school. Prior to the dramatic increase in plaintiff's income, the parties, with the assistance of Hartz as mediator, agreed to divide the cost of the children's private school with plaintiff assuming 79% of the cost and defendant assuming 21% of the cost. Defendant sought an increase in plaintiff's contribution. The judge denied the increase. We conclude that plaintiff should assume the full cost of the children's private school education.
Plaintiff does not argue that the award of the mediator was binding. Rather, he maintains that, because the original property settlement did not obligate him to pay for the children's private school, any award *544 established by the mediator, to which he voluntarily agreed, should be upheld. In essence, he argues that his payment of the private school tuition is, and always has been, a voluntary undertaking on his part.
The original property settlement agreement, however, did call for plaintiff to make payments towards his children's private school tuition for the 1996 and 1997 school years. Subsequent years were to be negotiable. The parties later mediated the matter with Hartz, who directed husband to pay 79% of the costs. Plaintiff was ordered to continue paying 79% of the costs. We are not persuaded that the mediated agreement is binding, as the agreement was entered into prior to resolution of the impact of the change in plaintiff's financial circumstances. We conclude that the issue of contribution for matters such as private school, at issue here, falls within the rule that we previously enunciated in Walton, supra, 248 N.J.Super. at 650-51, 591 A.2d 1018.
The example cited by Judgenow Justice Longof private school costs was not inadvertent and applies with particular force here. This is not an instance where private school was an afterthought or part of defendant's "wish-list" for her children, but an issue negotiated by the parties prior to the increase in income. The children have been attending private school, and as the record reflects, have had success in doing so. Given plaintiff's substantial increase in income, we find no basis for a percentage allocation of the cost of this benefit but conclude that plaintiff should assume the entire cost of such schooling. As we noted earlier, he does not dispute his ability to pay; moreover, this is exactly the type of benefit, in addition to increased child support, that we explicitly referred to in our decision in Walton.
Finally, we reject as without merit and without the necessity of comment defendant's arguments regarding counsel fees and expenses; a remand to a different judge; and plaintiff's claims regarding retroactivity. See R. 2:11-3(e)(1)(E).
IV.
We reverse the order of November 15, 2000, denying defendant's motion to remove the guardian ad litem and mediator; we reverse that part of the order of February 16, 2000, allocating 79% of the private school costs to plaintiff and remand for the entry of an order allocating 100% of such costs to plaintiff as of the date of the filing of the motion seeking such relief; in all other respects the order of February 16, 2000 is affirmed.
NOTES
[1] Despite the language in the order suggesting that the mediator's determination would be binding on the parties, both the judge and the parties acknowledged that this was not the case, and in the event a dispute was not resolved by mediation, the judge would ultimately resolve the issue. See P.T. v. M.S., 325 N.J.Super. 193, 216, 738 A.2d 385 (App.Div. 1999). Although characterized as "mediation," Hartz's role appeared to be one of an arbitrator rather than mediator. Despite the obvious distinction between a mediator and arbitrator, we conclude that the result here is not altered by the nomenclature attached to Hartz's appointment.
[2] Since we conclude that defendant was entitled to plaintiff's personal tax returns, his investment income would be revealed in any event.
[3] In fact, the Supreme Court, in response to a recommendation from its Special Committee on Matrimonial Litigation, see Final Report of the Supreme Court Special Committee on Matrimonial Litigation, Recommendation # 44, 166-68 (February 4, 1998), recently adopted the Pilot Program for the Mediation of Economic Aspects of Family Law Cases. See Notices to the Bar, 167 N.J.L.J. 56 (January 7, 2002). Of particular interest is that the program permits the parties to select the mediator from an approved roster of mediators. Such selection process avoids the conflict presented here. See Pressler, Current N.J. Court Rules, Appendix XIX, at 2426 (2002).
[4] N.J.S.A. 2A:34-23(a) provides:

In determining the amount to be paid by a parent for support of the child and the period during which the duty of support is owed, the court in those cases not governed by court rule shall consider, but not be limited to, the following factors:
(1) Needs of the child;
(2) Standard of living and economic circumstances of each parent;
(3) All sources of income and assets of each parent;
(4) Earning ability of each parent, including educational background, training, employment skills, work experience, custodial responsibility for children including the cost of providing child care and the length of time and cost of each parent to obtain training or experience for appropriate employment;
(5) Need and capacity of the child for education, including higher education;
(6) Age and health of the child and each parent;
(7) Income, assets and earning ability of the child;
(8) Responsibility of the parents for the court-ordered support of others;
(9) Reasonable debts and liabilities of each child and parent; and
(10) Any other factors the court may deem relevant.
[5] We note that this case involves a post-judgment increase in child support. We do not address the relative weight of each N.J.S.A. 2A:34-23(a) factor on an initial child support application since the then current lifestyle of the parents will be before the judge and part of any consideration of a child support award.
[6] We recognize that both a parent's high income and current needs may change over time and while present "overindulgence" may be a legitimate consideration in a current child support award, a true "sharing" in a parent's good fortune may include a potential for future savings and securing a child's future. Among appropriate methodologies to provide for future support and "sharing" is the "good fortune trust." See Morgan, supra, 13 Can. J. Fam. L. at 200-01 (discussing generally the use of such trusts); see also Thomas C. Quinlen, Planning for the Future, 2 Vand. J. Ent. L. & Prac. 108 (Winter 2000). Since such trust was not in issue here, we need not explore the parameters for its use.