# RECORD IMPOUNDED

## NOT FOR PUBLICATION WITHOUT THE
## APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1651-18T4

NYLEMA NABBIE,

      Plaintiff-Respondent,

v.

CHRISTOPHER J. O'CONNOR,

      Defendant-Appellant.

_____

> Argued January 23, 2020 – Decided May 4, 2020
>
> Before Judges Koblitz, Whipple and Gooden Brown.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FD-02-1019-17.
>
> E. Sandra Choi argued the cause for appellant (Choi Law Firm, attorneys; E. Sandra Choi, of counsel and on the briefs; Marc Andrew Williams, on the briefs).
>
> William John Heimbuch argued the cause for respondent (Heimbuch & Solimano, PC, attorneys; William John Heimbuch, on the brief).

PER CURIAM

Defendant Christopher J. O'Connor appeals from October 31, 2018 Family Part orders awarding plaintiff counsel fees, as well as child support in the amount of $2909 per month, which included a discretionary amount of $1000 above the recommendations of the Child Support Guidelines, Rule 5:6A, (Guidelines). We affirm.

We discern the following facts from the record. Plaintiff and defendant have a son born in the spring of 2004. Although previously in a relationship, they were not in a relationship during plaintiff's pregnancy or at their son's birth; plaintiff lived in Teaneck and defendant lived in New York City. After the child's birth, defendant stayed in plaintiff's home for two to three months and then moved back to his apartment in New York in August 2004 while the child remained with plaintiff.

Plaintiff worked as an attorney part-time until the child went into first grade, then worked full time. Defendant worked in the financial services industry and was a high earner. Until this litigation commenced, there was no formal child support order in place. Plaintiff would tell defendant her expenses as to the child, and defendant would pay her half of what he deemed necessary, despite his significantly higher income.

A-1651-18T4

Generally, the child spent every other weekend with defendant, defendant and plaintiff both spent his birthday with him, and holidays were alternated. The child attended preschool in Tenafly, for which plaintiff paid. Plaintiff made all medical and dental appointments for the child and drove him there, and also took him to all of his activities, sometimes leaving work early to do so. In 2007, plaintiff had financial difficulties and borrowed $110,000 from defendant.

Around October 2009, when the child was about to start grade school, plaintiff and defendant determined which would be the best school system for the child, and defendant bought a house within that district for $800,000, put $500,000 worth of renovations into the house, and plaintiff and the child lived there from 2009 until 2013. Defendant also lived there for a few months, but then moved out. Plaintiff testified part of defendant's motivation to buy the house was for the real estate and mortgage interest tax deductions. Plaintiff paid utilities, but did not pay rent, and defendant paid the $5900 carrying costs, considering this his financial support for the child during that time.

In October 2013, plaintiff moved out of the house to a condominium, defendant moved back into the house, and they shared custody and parenting time evenly. Defendant then lost his job in September 2014.

3

In March 2016, after the child began to spend much less time with defendant, the house was sold and defendant, still unemployed, moved to New York City, purportedly to improve his career networking opportunities. Defendant moved into a one-bedroom apartment and testified that he reduced his living expenses by over $2000 per month, in that the rent was $4545 per month, but he received two months out of the year free.

In February 2017, defendant wrote to plaintiff that she was behind in her loan repayments and asked her to make payments of $2600 per month to pay off the loan in full by 2022. Plaintiff testified she asked defendant if they could reach an understanding in terms of fair support, to which he responded he could not afford it.

In March 2017 the parties, with counsel, tried to negotiate an agreement for child support but were unsuccessful. On April 11, 2017, plaintiff filed a complaint against defendant to establish paternity, child support, custody, and parenting time, and asked defendant to ask his attorney to forward a settlement proposal to her attorney. Plaintiff's first Case Information Statement (CIS) dated March 30, 2017, listed expenses of $4880 for the child only, and $6247 in joint expenses. A second CIS, dated June 1, 2017, showed expenses of $5349 for the

child only, and $7099 in joint expenses. On May 22, 2017, the trial court ordered interim child support of $1750 per month.

In a letter brief dated June 8, 2017, defendant asserted he had just cause for his continued unemployment, that his gross income was $57,500 based on his 2016 tax return, and his child support obligation should be $378 per month, since plaintiff's gross weekly income was $3270 and defendant's was $1105, for a share of income of 72.72% and 27.28%, respectively. Defendant argued that if income were to be imputed to him, it should be $91,000 per year, and in that case, based on plaintiff's gross weekly income of $3270 and defendant's allegedly-appropriate imputed $91,000, total child support would be $522 per month with defendant's share being thirty-six percent.

The trial court ordered both parties to submit certifications. The court found its prior interim order of $1750 low after its review of the totality of the circumstances, so it ordered interim support of $3000 per month to begin July 1. Shortly thereafter, defendant filed a separate suit against plaintiff alleging she defaulted on the $110,000 loan.

Defendant submitted a certification asserting that $2812.20 per month was the maximum child support amount that should be allocated between himself and plaintiff pursuant to their income ratios. Defendant asked the trial court to

5

conduct a plenary hearing so he could elaborate on his job search efforts to show he was involuntarily unemployed, as well as to "carefully review and scrutinize plaintiff's CIS," especially as to shelter expenses, transportation expenses, and the child's purported monthly expenses. Defendant contended "a plenary hearing is necessary," and the monthly expenses in plaintiff's CIS were the reason defendant was unwilling to settle "based off the incorrect amounts provided in plaintiff's CIS."

Plaintiff submitted a third CIS, dated July 21, 2017, showing expenses of $3278 for the child only, and $6101 in joint expenses, with forty-five percent of shelter and transportation expenses allocated to the child based on the sole custodial parenting arrangement.

A plenary hearing began December 4, 2017; defendant appeared pro se, while plaintiff was represented by counsel. The child was thirteen years old and in eighth grade. He was a good student and participated in gifted classes, played tennis, and worked out at the gym with a trainer.

Plaintiff's 2016 tax return showed base earnings of $126,284 with $43,547 in additional earnings, and $168 taxable interest for total earnings of $169,999. Plaintiff listed $80,384 in total gross assets, with $3892 in savings in the child's name and $58,394 in a retirement account that would not be accessible within

the next four years, for a total of $18,098 in accessible savings. Plaintiff showed liabilities of $22,110 – with "TBD"[1] as to the 2007 loan between the parties. Thus, considering only accessible assets, plaintiff had a negative net worth of $4000 before the loan was taken into consideration; the repayment of the loan was estimated to be somewhere between $90,000 and $140,000.

Before he lost his job in September 2014, defendant earned $833,614 in 2014, which included a $347,638.13 severance package; $535,267 in 2013; $569,291 in 2012; and $564,757 in 2011. Defendant also had an investment account valued at $1,270,642.14 as of February 2018. After he lost his job, defendant's 2015 tax return showed $175,966 earned income from investment accounts and deferred compensation, his 2016 tax return showed $57,538 earned income from earned interest and deferred compensation, and his 2017 tax return showed earnings of $24,424 from earned interest and deferred compensation.

Defendant testified he and plaintiff maintained a cordial relationship and that he made consistent monthly child support payments to plaintiff, producing a chart of checks paid to plaintiff from 2004 through 2017. Before he was court-ordered to pay child support in July 2017, defendant made payments from August 2004 through December 2016 that ranged from a low of $44.19 in July

---

[1]  To be determined.

2012 to a high of $6000 in March 2006. Depending on whether the months plaintiff lived rent-free in defendant's house and defendant paid the carrying costs are considered, the payments averaged between $814.90 and $1155.74 per month, not including the $110,000 loan he made to plaintiff in February 2007.

Plaintiff, on the other hand, certified the "protocol" in place was

> rather than the defendant providing me with an established sum every month for [the child]'s support, I was required to identify each expense that [the child] incurred during the month and justify each expense by explaining why it was incurred. After the defendant reviewed the expense, he would unilaterally determine if he would contribute toward it and then, calculate the portion for which he was financially responsible. Although the defendant was substantially out-earning me as evidenced by his income tax returns, he always allocated the expense evenly between himself and me.

Plaintiff testified that defendant did not contribute to the "larger expenses" like housing, transportation, utilities, or food. Plaintiff asserted defendant also refused to contribute toward the child's computer, because plaintiff might use it, or the child's entertainment expenses, including X-box games, among other things, and that defendant's support was limited to clothing, monthly iPhone charges, limited purchases from Staples, class photos, lunch, childcare, co-pays for doctor visits, camps, activities, and the child's flute.

Plaintiff testified she went along with defendant's system for fear that defendant would try to alienate the child from her. However, now that the child was getting older and his expenses were increasing, she could "no longer live day-to-day haggling with the defendant over the expenses he will and will not contribute toward," as evidenced by "defendant's responding certification where he picks at every expense that [plaintiff] identified for the child."

Plaintiff testified she calculated the fixed costs in her CIS by averaging six months' worth of electric, water, and gas, and did the same for all non-fixed expenses, such as food, school lunches, and three primary restaurants the child frequented.

Plaintiff asserted that rather than inflating her CIS, as defendant alleged, she underestimated and left off many expenses, including fast food other than the three primary restaurants, the child's spending money, his X-box expenses, as well as other miscellaneous expenses for school activities and supplies. As to the gym membership, plaintiff testified she only included the base fee of $50, and not the $99 per week with the personal trainer. Plaintiff also testified she averaged out payments for gifted classes, and that the vacation average on the CIS only reflected one large vacation, not the additional flights out-of-state she

and the child took to visit family over the holidays. Plaintiff testified some of the debt on her CIS was for the child's computer and his flute.

Plaintiff also testified as to credit card statements and receipts she submitted with her certification, in response to defendant's challenge to her CIS, to show she had costs above and beyond what was in her CIS. Some of the increased expenses were: hiring someone to drive the child to tennis and other activities, which cost between $65 to $100 per week; a second night of tennis lessons the child requested; plaintiff's increase in her mobile phone bill due to the child's increased data use; a bike the child wanted, which would cost $400; a calculator he needed for eighth grade at a cost of $141; a first day of school kit for eighth grade; a Spotify subscription the child asked for to download music; $125 in class dues for eighth grade; and books the child asked her to order.

Defendant disputed plaintiff's expenses and submitted the child's school lunch statements, field trip expenses, and a chart with "[d]efendant's [c]orrections" to plaintiff's CIS which resulted in $2092 in expenses attributed to the child versus the $5349 plaintiff's CIS showed.

Defendant, who holds a degree in finance and is a Chartered Financial Analyst, testified as to his continued unemployment status. To support his

contention that his unemployment was involuntary, defendant submitted his resume, an article showing the demise of the type of work he last did, and a list of companies to which he applied from January 2015 through April 2017. Defendant also submitted job rejection emails he received from January through May 2017.

Defendant submitted the names of additional companies to which he had applied since March 2017; most of the applications were between May and November 2017. Defendant asserted his job search was his top priority, and that he looked for jobs "each and every workday during business hours from 9 a.m. until 5 p.m.," met with business contacts over dinner if opportunities arose, and "any personal activities such as golf would be engaged in either early morning prior to work or late afternoon after the workday was finished."

Despite his unemployment, defendant remained a member of a private golf club until November 2017 and was a member of the board of governors and chairman of the green committee. Documents received in response to a subpoena indicate charges at the club between January 2014 and August 2017 ranging from $1400 to $2800 monthly, in addition to dues. Defendant asserted this was "a part of my lifestyle that was shared completely with [the child]," as he would often take the child and his friends. Defendant resigned from the golf

11

club in November 2017 because his "severance and deferred compensation wages diminish[ed]." When challenged on the amount of golf he played while unemployed, defendant testified that it was a leisure activity he did around his job search.

Defendant also continued to dine out at New York City restaurants during his unemployment, which he testified was either with the child, for potential job connections, or for special occasions with family. Toward the end of the plenary hearing, defendant revealed that he moved to Massachusetts in March 2018 to live with his family, purportedly to save "over $4000 a month in shelter expenses."

Although he appeared pro se at the plenary hearing, defendant asked for legal fees, asserting they totaled $34,379.23 throughout the entire litigation process, although he did not supply an affidavit of services. Plaintiff also submitted a request for legal fees, asking that defendant make a "reasonable contribution" to her counsel fees, which was supported by an affidavit.

The court issued its decision on the record orally on October 31, 2018, awarding plaintiff $2909.20 per month in child support, comprised of a $1909.20 base amount and a supplemental discretionary amount of $1000, as well as counsel fees.

Our review of a trial court's fact-finding is limited. Colca v. Anson, 413 N.J. Super. 405, 412-13 (App. Div. 2010) (citing Cesare v. Cesare, 154 N.J. 394, 411 (1998)). We grant a trial court substantial deference regarding its findings of fact and conclusions of law, and will only disturb them "if they are 'manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence.'" Id. at 413 (quoting Crespo v. Crespo, 395 N.J. Super. 190, 193-94 (App. Div. 2007) (quoting Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974))). Because a family court has "special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare, 154 N.J. at 413. On the other hand, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Tp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

I

Defendant first argues that, viewing the record in its entirety, plaintiff should not have been awarded counsel fees and the court erred in its application of Rule 5:3-5(c).

The trial court, after considering factors one, two, three, four, seven, and eight under Rule 5:3-5(c), awarded plaintiff counsel fees in the amount of

$47,206.53. The trial court had imputed $500,000 of income to defendant, whereas plaintiff earned approximately $157,000 per year. With his imputed income, defendant had "a superior ability to pay attorney's fees when compared with" plaintiff's ability.

As to the reasonableness and good faith of the positions advanced by the parties, the trial court found that while defendant may have truly believed he had the correct position and the court did not believe he acted in bad faith when he insisted on the plenary hearing, the court found defendant's position "was, in fact, incorrect," and not corroborated by law. Plaintiff incurred $47,206.53 in counsel fees for the litigation, whereas defendant was self-represented for the plenary hearing, and there "was no information provided by the defendant as to how much he paid his prior law firm."

Regarding the results obtained, the court noted that defendant's position was rejected by the court and plaintiff's position was granted, though not to the extent she requested, and child support was granted in an amount greater than that believed to be appropriate by defendant but less than the amount sought by plaintiff. The trial court then considered the affidavit of services submitted by plaintiff's attorney, and under the RPC 1.5(a) factors found the fees reasonable.

The trial court found neither party acted in bad faith during the litigation, but "there [was] little doubt in the mind of [the] [c]ourt that the plaintiff's position regarding calculation of child support was the correct position and that the defendant's position of pursuing this litigation has led to the plaintiff being responsible for substantial attorney's fees and costs in defending her position." It concluded that defendant was better able to pay plaintiff's attorney's fees, especially given defendant "was not required to pay attorney's fees for the hearing," and awarded plaintiff counsel fees "in the amount requested of $45,250 plus disbursements in the amount [of] $1956.43" for a total of $47,206.53.

We will not disturb a counsel fee award unless it is shown there was "an abuse of discretion involving a clear error in judgment." Tannen v. Tannen, 416 N.J. Super. 248, 285 (App. Div. 2010). In family actions, where both parties act in good faith, counsel fees may be awarded where the parties' "economic positions [are] disparate." Kelly v. Kelly, 262 N.J. Super. 303, 307 (App. Div. 1992). Here, the court properly considered all of the factors under Rule 5:3-5(c). As it found that neither party acted in bad faith, it considered the economic disparity between plaintiff and defendant, as permitted by Kelly, noting defendant's imputed income of $500,000 and substantial assets of $1,270,642.14, as compared to plaintiff's salary of $169,999 and negative net

A-1651-18T4

worth of $4000, not including her loan from defendant. Because the record supports the award of counsel fees, we discern no abuse of discretion.

II

Defendant next argues that, since this case involves high-earning parents, the maximum Guidelines award in Appendix IX-F[2] represents the minimum gross award for the child's expenses, and the child's presumptive total award under the Guidelines, to be apportioned between the parents, would be $2474. Defendant asserts that plaintiff's monthly expenses for the child were inflated and challenges the trial court's additional $1000 award to defendant's Guidelines-based contribution of $1909.20.

Defendant further argues that plaintiff presented no specific evidence the child's expenses were anticipated to rise dramatically in high school, and that the trial court did not cite any evidence either, but rather "casually observed that [the child] would likely pursue 'more mature' educational endeavors." Defendant contends the record does not disclose any upcoming expenses associated with the child's freshman or sophomore years in a public high school not already covered by the CIS and the Guidelines.

---

[2] Pressler & Verniero, Current N.J. Court Rules, Appendix IX-F to R. 5:6A, www.gannlaw.com (2017).

The court found defendant's contribution to the Guidelines base award, using the Sole Parenting Worksheet, was $1909.20.[3] In finding that an additional $1000 per month was warranted, for a total monthly payment of $2909.20, the trial court considered the reasonable needs of the child in the context of the standard of living of the parties, as well as the best interests of the child after giving due consideration to the relevant factors under N.J.S.A. 2A:34-23(a).

A trial court has "substantial discretion in making a child support award." Foust v. Glaser, 340 N.J. Super. 312, 315 (App. Div. 2001) (citing Pascale v. Pascale, 140 N.J. 583, 594 (1995)). An award that is consistent with the law "will not be disturbed unless it is 'manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice.'" Id. at

---

[3] The Guidelines awards in Appendix IX-F "represent the average amount that intact families spend on their children," and "include the child's share of expenses for housing, food, clothing, transportation, entertainment, unreimbursed health care up to and including $250 per child per year, and miscellaneous items." Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A at ¶ 8, www.gannlaw.com (2017). After taking the Guidelines award amount from Appendix IX-F that corresponds to the combined income of both parents, then using the Guidelines worksheet to adjust for childcare, health insurance, and other expenses, each parent must then contribute a percentage of that Guidelines award based on their respective incomes, using the Sole Parenting Worksheet where the non-custodial parent spends less than two overnights per week with the child. Id. at Appendix IX-C at lines 7, 13, 14; id. at Appendix IX-B.

315-16 (quoting <u>Raynor v. Raynor</u>, 319 N.J. Super. 591, 605 (App. Div. 1999)). There is an abuse of discretion where a decision was "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." <u>Jacoby v. Jacoby</u>, 427 N.J. Super. 109, 116 (App. Div. 2012) (quoting <u>Flagg v. Essex Cnty. Prosecutor</u>, 171 N.J. 561, 571 (2002)).

Where the combined net income of the parents is more than $187,200 per year, the family is considered high-income, and the court must apply the Guidelines up to the maximum amount as set forth in Appendix IX-F, and supplement that amount with a discretionary amount based on the remaining family income and factors set forth in N.J.S.A. 2A:34-23; the total award for the child cannot be less than that for a family with a net income of $187,200 per year. Pressler & Verniero, <u>Current N.J. Court Rules</u>, Appendix IX-A to <u>R.</u> 5:6A at ¶ 20(b), www.gannlaw.com (2017); Fall & Romanowski, <u>N.J. Family Law: Child Custody, Protection & Support</u> § 35:3-3 (2019). The maximum total amount for the child under Appendix IX-F, to be apportioned to each parent according to their respective incomes, is $571 per week, which is $2474 per month. Pressler & Verniero, <u>Current N.J. Court Rules</u>, Appendix IX-F to <u>R.</u> 5:6A, www.gannlaw.com (2017).

When considering the additional discretionary amount to that base award in the context of high-income families, "the dominant guideline for consideration is the reasonable needs of the children, which must be addressed in the context of the standard of living of the parties." Isaacson v. Isaacson, 348 N.J. Super. 560, 581 (App. Div. 2002). When considering the "age factor," "the needs of an infant child are distinctly different from the needs of teenage children." Ibid. Where the initial support order is entered after the child turns twelve, the basic support obligation should be adjusted upward "to account for the increased costs associated with raising older children." Fall & Romanowski, § 35:2-2(b)(1); see also Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A at ¶ 17, www.gannlaw.com (2017).

A balance must be struck between reasonable needs that reflect lifestyle opportunities, while avoiding an "inappropriate windfall to the child," and "[u]ltimately, the needs of a child . . . also calls to the fore the best interests of the child," and "needs" should be in line with the standard of living of both parents. Isaacson, 348 N.J. Super. at 582. Further, "the law is not offended if there is some incidental benefit to the custodial parent from increased child support," id. at 584, "but a custodial parent cannot through the guise of the incidental benefits of child support gain a benefit beyond that which is merely

incidental to a benefit being conferred on the child," especially where there is no alimony, <u>Loro v. Colliano</u>, 354 N.J. Super. 212, 225-26 (App. Div. 2002).

Here, the child was over twelve years old at the time of this initial support order, and the court properly considered the statutory factors under N.J.S.A. 2A:34-23, as well as the reasonable needs of the child in the context of the parents' lifestyles, in determining the additional discretionary amount. We discern no abuse of the court's discretion to supplement the award.

### III

Finally, defendant argues that plaintiff adduced no evidence sufficient to prove defendant was voluntarily unemployed, but rather, "his extensive job search history revealed a professional who was displaced by economic turmoil and was desperately trying to find a job," and that the imputation of $500,000 was "speculative."

The court imputed income to defendant under Appendix IX-A,[4] after questioning the credibility of defendant's testimony that he had tried to find employment. The court found although defendant was initially terminated from his employment in September 2014 "in the natural and due course of business,"

---

[4] Pressler & Verniero, <u>Current N.J. Court Rules</u>, Appendix IX-A to <u>R.</u> 5:6A, www.gannlaw.com (2017).

he was unemployed for over two and a half years before plaintiff's complaint was filed and produced no evidence he was actively seeking employment during that time. The court found although defendant portrayed himself as aggressively attempting to obtain employment after the complaint was filed, it appeared that defendant's long period of unemployment was defendant's "ultimate choice," and there was "no way for this [c]ourt to know what the defendant's employment prospects would have been had he . . . begun searching for a position soon after he was released by his former employer." The court noted defendant's efforts to find employment seemed to "severely taper[] off" toward the end of litigation, "suggesting that his efforts could have been solely for the purpose of this litigation."

Based on defendant's CIS and documents presented at the hearing, the court found defendant "appears to live a lifestyle similar to the one he lived while he was earning significantly greater income" except for "allegedly" moving to Massachusetts to live with family members.

Referring to Appendix IX-A at ¶ 12, the court found there was "little doubt" defendant possessed high earning potential, and that his "work history, occupational qualifications and educational background as testified to by the plaintiff would confirm an earning potential similar to his earning ability in the

past." Based on its finding that defendant's unemployment, while initially involuntary, was now voluntary, the court imputed income to defendant and found defendant could pay the cost of child support from his "substantial assets" which included "significant investment accounts" including his account containing $1,270,642.14.

As to the proper amount of imputed income, the court rejected defendant's claim he should be imputed $68,000, finding "[d]efendant's analysis failed to consider his history of significant earnings or that this [c]ourt finds that he only aggressively looked for a job for a minimum period of time that took place nearly two years after the termination of his employment."

In determining the appropriate amount to impute, the court considered defendant's work history, occupational qualifications, educational background, and prevailing job opportunities in the region, noting defendant had an extensive employment history in financial portfolio management and investing from 2001 until 2014. While the court attributed some of defendant's unsuccessful job search attempts to defendant's delay in seeking re-employment, the court did note some of defendant's difficulties "may be a limited amount of high paying positions."

The court found for the years 2011, 2012, and 2013, defendant's total

income was $564,757, $569,291, and $535,267 respectively for an average of $556,438.33. Considering the factors in Caplan[5], the court imputed an income of $500,000 to defendant.

"Whether to impute income is a question of fact and is left to the trial court's sound discretion." Fall & Romanowski, § 35:2-1(c)(1) (citing Tash v. Tash, 353 N.J. Super. 94, 99-100 (App. Div. 2002)). We will not reverse a decision unless we find it was made on an "impermissible basis," considered "irrelevant or inappropriate factors," did not consider "controlling legal principles," or the findings were unsupported by "competent evidence." Lall v. Shivani, 448 N.J. Super. 38, 50 (App. Div. 2016) (citations omitted). Further, "[w]e defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414 (2015) (quoting Cesare, 154 N.J. at 412).

The fairness of a child support award using the Guidelines depends on accurately determining a parent's income. Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A at ¶ 12, www.gannlaw.com (2017). "If

---

[5] Caplan v. Caplan, 182 N.J. 250 (2005).

the court finds that either parent is, without just cause, voluntarily underemployed or unemployed, it shall impute income" based on potential employment and earning capacity using the parent's work history, occupational qualifications, educational background, and prevailing job opportunities in the region. Ibid. The court "may impute income based on the parent's former income." Id. at ¶ 12(a). See also Caplan v. Caplan, 182 N.J. 250, 264-65 (2005); Lall, 448 N.J. Super. at 50. Further, it is the obligor's burden to establish their actual earnings are in line with their earning capacity to avoid imputed income. Lall, 448 N.J. Super. at 50 (citing Storey v. Storey, 373 N.J. Super. 464, 474 (App. Div. 2004)).

Defendant was totally unemployed, not disabled, and in his forties. The court did not find defendant credible, in that his job search appeared minimal and only began when litigation started. The court's finding that defendant possessed high earning potential is supported by the record, in that defendant's resume shows a degree in finance and a long employment history, and his past income tax returns show a high salary. The court's use of defendant's former income is permitted by Appendix IX-A at ¶ 12, Caplan, and Lall, and the court did round the imputed income down to $500,000, noting there may be limited availability of high-paying positions.

It is the "obligor's" responsibility to establish their actual earnings are in line with their earning capacity under <u>Lall</u> and <u>Storey</u>. Defendant did not produce an expert or any proofs other than his own applications and e-mails from his job search, which the court did not find sufficient.

Therefore, because the court's imputation of $500,00 was not made on an impermissible basis, did not consider irrelevant or inappropriate factors, and its findings were supported by competent evidence in the record, we do not find an abuse of discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1651-18T4